[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-11840
Non-Argument Calendar
_____

D.C. Docket No. 0:15-cr-60172-WPD-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

HARLAN DECOSTE,
a.k.a. Money King,
a.k.a. Moneyking_111,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(May 17, 2017)

Before WILLIAM PRYOR, MARTIN and ANDERSON, Circuit Judges.

PER CURIAM:

Harlan Decoste appeals his sentence of 210 months of imprisonment, which was imposed following his pleas of guilty to conspiring to defraud the United States, 18 U.S.C. § 286; conspiring to possess 15 or more unauthorized access devices, *id.* § 1029(b)(2); and possessing 15 or more unauthorized access devices, *id.* § 1029(a)(3). Decoste also pleaded guilty to aggravated identity theft and the district court imposed a mandatory consecutive sentence of 24 months, *id.* § 1028A(a)(1), (b)(2), which Decoste does not appeal. Decoste challenges the enhancements to his sentence for causing a loss of more than $25 million, United States Sentencing Guidelines Manual § 2B1.1(b)(1)(L) (Nov. 2015); for being a leader of the conspiracy, *id.* § 3B1.1(a); for using or attempting to use a minor to commit his offense, *id.* § 3B1.4; and for use of sophisticated means, *id.* § 2B1.1(b)(10)(C). We affirm.

The district court did not clearly err in finding that Decoste caused a loss of $26.3 million. Decoste does not contest the $14.5 million that the district court assessed Decoste for the 29,000 items of stolen personal identification information discovered in a house in Miramar, Florida, that served as his residence and the base of operations for the conspiracy. The district court also attributed to Decoste $11.8 million in tax refunds claimed on fraudulent tax returns that were filed from internet protocol address 71.206.68.241. Decoste, for the first time on appeal, disclaims responsibility for $6.1 million of the refunds tied to the internet protocol

2

address. He argues that the address was misused by "others who were never identified," but we cannot say that the district court plainly erred, *see United States v. Cobb*, 842 F.3d 1213, 1221 (11th Cir. 2016), by making a contrary finding. Decoste acknowledges that $5.7 million of the fraudulent returns incorporated stolen identification information found in the Miramar residence, and all the fraudulent returns reported identical occupations, wages, and amounts for withholding and contained identical misspellings of the word "manager." Decoste also admitted that he used the internet protocol address to file one fraudulent tax return and to post messages on his Instagram account and that his fingerprints and stolen personal identification information were found on an Apple MacBook Air computer that connected repeatedly to the internet protocol address. The district court reasonably inferred from the evidence that Decoste was responsible for all the fraudulent tax returns. *See United States v. Almedina*, 686 F.3d 1312, 1315 (11th Cir. 2012). And the calculation of Decoste's loss amount was not based on speculation. After hearing the evidence, the district court rejected the $80 million loss amount proposed by the government and made a reasonable, even conservative, estimate of loss based on the loss amounts attributable to stolen identification information and to the fraudulent tax returns that were filed electronically using a specific internet protocol address. *See id.* The district court did not clearly err in determining that Decoste caused a loss of more than $25

3

million and applying the corresponding 22-level enhancement to his offense level. *See* U.S.S.G. § 2B1.1(b)(1)(L).

The district court also did not clearly err in finding that Decoste was a leader of the conspiracy. A defendant is subject to a four-level increase in his offense level if he "was an organizer or leader of a criminal activity." *Id.* § 3B1.1(a). Decoste owned "GroundUp 111 Entertainment," a company with no identifiable form of income, and its articles of incorporation listed Decoste as the president and chief executive officer and two of his conspirators in the subordinate roles of vice president and treasurer. Decoste used the online name "MoneyKing111" and posted messages on social media stating that he was "a boss," "put[] people in position," made money "so [his] whole team be shining," and had to "stop hangin [sic] with workers." Decoste's use of the title "boss" by itself is not dispositive, *see id.* § 3B1.1 cmt. n.4, but he posted with his messages photographs of items connected to the conspiracy, such as drugs, a debit card, and expensive luxury items from which the district court reasonably inferred that Decoste exercised decision making authority in the criminal enterprise. Decoste also controlled his coconspirators after investigators halted operations at the Miramar residence and arrested Decoste for other fraudulent activities. While imprisoned, officers recorded telephone calls in which Decoste directed coconspirators to access files on his computer and to "handle" fraudulent filings. *See United States v. Villarreal*,

613 F.3d 1344, 1359 (11th Cir. 2010). Decoste qualified as an organizer or leader of the conspiracy.

The district court did not clearly err by enhancing Decoste's base offense level for using his minor brother, Frantz, in the conspiracy. A two-level enhancement is appropriate if a defendant "used or attempted to use a person less than eighteen years of age to commit the offense or assist in avoiding detection of, or apprehension for, the offense." U.S.S.G. § 3B1.4. Frantz participated in the conspiracy while still a minor. Several months before Frantz turned eighteen years old, investigators seized from his bedroom in the Miramar residence several items of stolen personal identification information and a debit card used to access tax refunds obtained fraudulently. And Decoste, as leader of the conspiracy, "used" his brother through "encouraging, . . . training, . . . recruiting, or soliciting" him to participate in the scheme to defraud. *See id.* § 3B1.4 cmt. n.1. The district court was entitled to find that Decoste enticed Frantz to join the conspiracy by allowing him to live in the Miramar residence, by exposing him to the wealth obtainable through the fraud scheme, and by buying him a $40,000 car. *See United States v. Taber*, 497 F.3d 1177, 1181 (11th Cir. 2007).

The district court also did not clearly err in applying a sentencing enhancement for Decoste's use of sophisticated means. Decoste was subject to a two-level increase of his offense level because the methods used to execute and

5

conceal the scheme to defraud were sophisticated. *See* U.S.S.G. § 2B1.1(b)(10)(C); *see also United States v. Ghertler*, 605 F.3d 1256, 1267 (11th Cir. 2010). The conspirators devised a complex method of amassing and exploiting stolen personal identification information. *See* U.S.S.G. § 2B1.1 cmt. n.9(b). They collected about 30,000 items of personal identification information by photographing lists displayed on computers, classified and stored the stolen information in electronic files on ten computers, and selected pieces of the stolen information to report in fraudulent tax returns. The conspirators also used sophisticated means to conceal their crimes and to launder the proceeds. *See id.* They filed tax returns on different computers containing software that hid the sender's internet protocol address; they communicated using email accounts created for temporary use that would later self-destruct; they had tax refunds mailed to multiple real and fictitious addresses; and they transferred the refunds to prepaid debit cards. Ample evidence supported the finding that Decoste used sophisticated means to perpetuate the scheme to defraud.

We **AFFIRM** Decoste's sentence.

6