[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-14400
_____

D.C. Docket No. 1:13-cr-00012-WLS-TQL-2

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

STEWART PARNELL,
MICHAEL PARNELL,
MARY WILKERSON,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Middle District of Georgia
_____

(January 23, 2018)

Before TJOFLAT, MARTIN, and ANDERSON, Circuit Judges.

PER CURIAM:

We have had the benefit of oral argument and carefully reviewed the parties'

briefs and the record. For the reasons discussed below, we conclude that the

judgment of the district court should be affirmed. Because this opinion applies only established law to these facts, it is written only for the benefit of the parties, who are familiar with the extensive facts of this case. Thus, we include only a brief summary of the facts below.

## I.  BACKGROUND

Defendant-Appellant Stewart Parnell is the former president of the Peanut Corporation of America ("PCA"). Defendant-Appellant Michael Parnell, Stewart's brother, managed PCA's sale of peanut paste to the Kellogg Company ("Kellogg's"). Defendant-Appellant Mary Wilkerson worked as PCA's quality assurance ("QA") director at its production plant in Blakely, Georgia from June 2008 through 2009. Until 2009, PCA made and sold peanut products to food producers across the United States. In 2009, federal authorities identified PCA's production plant in Blakely, Georgia as the source of a nationwide salmonella outbreak. The Food and  Drug Administration ("FDA") initiated an inspection of PCA's Blakely facility. Following a four year investigation, Appellants were indicted for their conduct regarding food safety at PCA and during the FDA's investigation.

During a seven-week jury trial, the Government presented evidence that Stewart and Michael conspired with senior management at PCA to defraud its customers regarding the safety of its products. Generally, to ensure that products

2

are safe for human consumption, peanut manufacturers like PCA send samples from a specific lot of product for microbiological testing before the lot is shipped. Many PCA customers required PCA to attach a Certificate of Analysis ("COA") to each lot of product, certifying that the lot tested negative for bacteria. At Stewart's direction, PCA retested product that tested positive for salmonella until it obtained a negative result, shipped product before receiving the test results for the product, and even shipped product after receiving confirmed positive test results.

The Government also presented evidence regarding a scheme that Stewart, Michael, and other senior management designed to help PCA meet production demands for the Kellogg's account. Specifically, in September 2007, PCA began assigning future lot numbers to samples of peanut paste that it sent for testing. It used those test results to create COAs for new lots of peanut paste that it shipped to Kellogg's. Thus beginning in September 2007, the COAs for Kellogg's orders contained test results for a sample pulled from a previous lot. The lot being shipped had not been tested. PCA took samples from the new lot, assigned future lot numbers to those samples, and sent them for testing to keep the practice going. PCA did not inform Kellogg's if test results for a lot that had already been shipped came back positive. Eventually, PCA assigned multiple future lot numbers to product from the same lot in order to decrease the number of lots that it tested.

3

Between January 2008 and January 2009, more than 60% of paste lots for Kellogg's did not undergo any microbiological testing.

All Appellants knew that PCA had received positive salmonella test results before the salmonella outbreak. But they were not forthcoming with the FDA during its investigation. FDA Agent Janet Gray testified that she asked Stewart "if he had any knowledge of other positives in 2008 [other than the four positive test results of which Agent Gray was already aware], and he said this is not something that happens very often and I think I would remember something positive. He said he had no knowledge of any others, but if there was positive results [sic] then certainly somebody at the plant would have knowledge of this." [Doc. 559 at 141.] Agent Gray testified that when she interviewed Wilkerson, she asked Wilkerson, "if there were any other positives in 2008, and she told me she was not working in QA beginning of the year and she was not aware of any positives." [Doc. 559 at 142.]

The jury found Stewart and Michael guilty of several counts of fraudulently introducing misbranded food into interstate commerce, interstate shipment and wire fraud, and conspiring to commit these offenses. The jury also found Stewart guilty of fraudulently introducing adulterated food into interstate commerce. The jury found Stewart and Wilkerson guilty of obstruction of justice. The district court sentenced Stewart to 336 months in prison, to be followed by three years of

4

supervised release; sentenced Michael to 240 months in prison, to be followed by three years of supervised release; and sentenced Wilkerson to 60 months in prison, to be followed by two years of supervised release. Appellants challenge their convictions and sentences. We address the multitude of issues raised by Appellants in turn below.

## II.  DISCUSSION

A.    All Appellants' Argument Based on Juror Exposure to Extrinsic Evidence

Prior to trial, Appellants moved to exclude evidence that the salmonella outbreak caused nine deaths and over seven hundred illnesses under Federal Rule of Evidence 403. At a hearing on the motion, the Government agreed not to present evidence of deaths, and the district court denied Appellants' motion with regards to evidence of illnesses. The jury heard evidence that the salmonella outbreak caused at least 700 illnesses at trial. The Government did not present any evidence that the salmonella outbreak caused deaths. After trial, Appellants filed a motion for new trial, claiming that the jury was exposed to extrinsic evidence about deaths. Appellants attached an affidavit from Juror 34, in which Juror 34 said that "several jurors mentioned that they had done their own research into the facts of this matter," the jury had discussed that the salmonella outbreak had caused nine deaths, and Juror 35 told Juror 34 during jury selection that she believed all of the

5

defendants were guilty because they had caused nine deaths. [Doc. 308-1 ¶¶ 3–4, 14.]

The district court held two hearings regarding the allegations of juror exposure to extrinsic evidence. During the first hearing, the court questioned Juror 34. Juror 34 testified that she encountered Wilkerson shortly after the trial at Wilkerson's daughter's cross country meet. Juror 34 approached Wilkerson to tell her that she had "done as much as I could for her, you know, praying for her in the trial, and I just felt like that it was prejudged and I didn't know what to do." [Doc. 591 at 22–23.] Juror 34 admitted being "emotional" and "kind of upset" when she spoke to Wilkerson. Following this incident, Stewart's co-counsel contacted Juror 34 and obtained her affidavit. The district court questioned Juror 34 at length about the affidavit. Juror 34 reiterated that certain jurors made comments that all Appellants were guilty and that they had killed nine people.

The district court questioned the remaining jurors, including the six alternates, at a second sealed proceeding. Juror 35 denied expressing an opinion about the case or about the guilt or innocence of a defendant to any prospective juror, stating "[t]his is a case I did not know anything about." [Doc. 592 at 22.] Regarding Juror 34's statement that Juror 35 had said during jury selection that the defendants were guilty and that they caused nine deaths, Juror 35 replied, "I didn't know how many deaths was caused. No. I didn't tell 34 that." [Doc. 592 at 11–12.]

6

Out of the remaining jurors and alternates, four reported hearing comments about deaths during trial—Juror 37 and Juror 10 reported hearing about deaths before deliberations, and Juror 4 and Juror 12 said that deaths were mentioned at some point during the period of time the jury deliberating.

Appellants argue that they are entitled to a new trial based on the jury's alleged exposure to extrinsic evidence that people died as a result of the salmonella outbreak. The Court reviews the denial of a motion for a new trial based on the submission of extrinsic evidence to the jury for an abuse of discretion. United States v. Whatley, 719 F.3d 1206, 1214 (11th Cir. 2013). The Court reviews the district court's underlying factual findings for clear error. United States v. Siegelman, 640 F.3d 1159, 1181 n.31 (11th Cir. 2011) (per curiam).

"When jurors consider extrinsic evidence, a new trial is required if the evidence poses a reasonable possibility of prejudice to the defendant." Whatley, 719 F.3d at 1219 (quoting United States v. Dortch, 696 F.3d 1104, 1110 (11th Cir. 2012)). "A defendant who alleges denial of the right to an impartial jury resulting from juror exposure to extraneous information has the burden of making a colorable showing that the exposure has, in fact, occurred." Id. (quoting Dortch, 696 F.3d at 1110). "If the defendant does so, prejudice to the defendant is presumed and the burden shifts to the government to show that the jurors' consideration of extrinsic evidence was harmless to the defendant." Id. (quoting

7

Dortch, 696 F.3d at 1110). The Government must show that the exposure was harmless beyond a reasonable doubt.[1] To determine whether the district court abused its discretion by concluding that exposure to extrinsic evidence was harmless, the Court considers four factors: (1) the nature of the extrinsic evidence; (2) the manner in which the extrinsic evidence reached the jury; (3) the factual findings in the district court and the manner of the court's inquiry into the juror issues; and (4) the strength of the government's case against the defendant. Whatley, 719 F.3d at 1219.

Although the district court ruled that Appellants failed to demonstrate that the jury was exposed to the fact that there had been several deaths resulting from the salmonella outbreak, we recognize that several jurors testified that they were aware that the salmonella outbreak caused deaths. In light of the fact that there was no evidence of deaths presented during trial, we assume arguendo that at least several of the jurors who sat on the case were exposed to extrinsic evidence. Therefore, our discussion proceeds directly to the prejudice issue.

With regards to the first factor—the nature of the extrinsic evidence—we cannot conclude that jurors' exposure to extrinsic evidence that the salmonella

---

[1]    "There is little, if any, difference between our statement in Fahy v. State of Connecticut about 'whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction' and requiring the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." Chapman v. California, 386 U.S. 18, 24, 87 S. Ct. 824, 828 (1967) (quoting Fahy v. Connecticut, 375 U.S. 85, 86–87, 84 S. Ct. 229, 230 (1963)).

outbreak caused deaths is not prejudicial at all. However during trial, the jury heard evidence regarding the exceedingly serious nature of the salmonella outbreak. For example, a doctor from the Center for Disease Control ("CDC") testified that the outbreak caused 714 known illnesses, 166 of which required hospitalization. Based on the number of reported illnesses, the doctor estimated that there were over 20,000 illnesses across the United States. The jury also heard evidence regarding the symptoms associated with salmonella, such as fever, bloody diarrhea, and vomiting, from the CDC doctor and a salmonella victim. Finally, the indictment itself, which the trial court read to the jury, indicated that salmonella can be life threatening. In light of all of this evidence, we cannot conclude that the exposure of several jurors to the fact that several people also died from the outbreak was highly prejudicial.

Regarding the manner in which the extrinsic evidence reached the jury, the jurors' testimony indicates that their knowledge of deaths came from overhearing pieces of news reports, faint memories about the incident, or passing comments from family members, fellow jurors, or venire members, not detailed news reports about the salmonella outbreak. None of the jurors who recalled hearing about deaths during trial or deliberations were able to remember details about the statements. The jurors' vague recall of these statements indicates their lack of impact on the jurors. Furthermore, no juror indicated that any comment about

9

deaths led to a discussion among the jurors. In fact, the majority of the jurors did not report being exposed to extrinsic evidence at all. Given the jury's limited exposure, this factor weighs strongly in favor of the government, meaning it strongly indicates that the exposure of several jurors to the fact that deaths had occurred did not affect or contribute to the jury verdict.

Given the thoroughness of the district court's investigation, the third factor, the manner of the district court's inquiry into the juror issues and the findings of the district court, also strongly favors the Government. The district court conducted two hearings in which it questioned the jurors outside of the presence of other jurors. After observing each juror's demeanor during a seven-week trial and their post-trial testimony, the district court concluded that Juror 34 was biased in favor of Wilkerson and refused to consider her testimony. Given the district court's ability to observe Juror 34's demeanor and the fact that Juror 34 approached Wilkerson after trial to express her sympathy, the district court did not clearly err by finding that Juror 34 was not credible.[2]

The final factor—the strength of the evidence—also strongly favors the Government. With respect to both Stewart and Michael, the evidence of guilt was overwhelming. As for evidence that Wilkerson was guilty of obstruction, the

---

[2]     The Court recognizes that the district court did not acknowledge that some of the testimony of the other jurors provided minor corroboration for Juror 34. But we cannot conclude that the district court's credibility determination regarding Juror 34 is clearly erroneous for the reasons stated above.

Government offered the testimony of Agent Gray. Agent Gray stated, "I asked Ms. Mary Wilkerson if she knew any—if there were any other positives in 2008, and she told me she was not working in QA beginning of the year and she was not aware of any positives." [Doc. 559 at 142.] The Government also introduced two emails indicating that Wilkerson knew about positive salmonella results at PCA in 2008. Specifically, in June 2008, Wilkerson wrote an email instructing other PCA employees to put a shipment on hold because the lot had tested presumptively positive for salmonella. Later that month, Wilkerson wrote the following in an email to the manager of a different PCA facility: "I know you don't know this but we have a problem with the granulation line and salmonella at least every other week if not every week, but when retested by a different lab it comes back ok." [Gov't Ex. 40-01.] Thus, the evidence that Wilkerson did know of positive salmonella results in 2008 was overwhelming. And while the obstruction of justice charge against Wilkerson was based on a single question and answer to Agent Gray during the investigation, the evidence is very clear that defendant Wilkerson lied to Agent Gray about not having knowledge of positive test results.[3]

---

[3]    Wilkerson's counsel attempted to portray to the jury that Agent Gray's question related only to January 2008. The problem with Wilkerson's argument is that there is no evidence at all to support her attorney's speculation that Agent Gray's question focused only on January 2008, rather than that entire year. Wilkerson's argument that Agent Gray asked Stewart, PCA operating manager Samuel Lightsey, and Wilkerson the same question is not to the contrary. According to an email that Agent Gray sent shortly after the investigation, she asked Lightsey about positives "going back to January of 2008." [Doc. 446-16.]

11

Given that three of the four factors weigh strongly in favor of the Government, consideration of the four factors indicates clearly that the extrinsic evidence did not influence or contribute to the jury verdict.

B.     All Appellants' Argument Based on Kilgore's and Lightsey's Lay Opinion Testimony

Appellants argue that the district court plainly erred by allowing PCA-Blakely's former operating managers, Samuel Lightsey and Daniel Kilgore, to testify that certain PCA business records, such as COAs, were "false" and that PCA could not have known that the product it shipped was safe based on the documents. Appellants concede that they failed to object to this evidence at trial. As the former operating managers of PCA-Blakely, Kilgore and Lightsey had extensive experience with the plant's testing practices. Both were also intimately familiar with PCA's fraudulent practices with regards to Kellogg's. Thus, they had ample knowledge from which to conclude that the COAs that they testified were false were in fact false and that PCA could not have known that the product shipped with the false COAs was safe. There is no error and certainly no plain error in admitting this testimony.

C.     Wilkerson's Challenge to the Sufficiency of the Evidence

The evidence discussed above makes clear that there was ample evidence to support the verdict of Wilkerson's guilt.

12

D.    Brady Issues Raised by Wilkerson[4]

Wilkerson argues that the Government violated Brady because she could not access or search the documents produced by the Government and therefore could not find Brady material. Wilkerson also objects to the number of documents that the Government produced and the late date of some of the productions. Specifically, Wilkerson objects to the Government producing a large hard drive of documents in late June 2014 when the trial was set to begin on July 14. According to Wilkerson, this production was one of many untimely data dumps, where the Government produced hard drives containing hundreds of thousands of documents that Wilkerson and her counsel did not have the resources to review for Brady material before trial.

Although Wilkerson argues on appeal that the documents were not searchable, the district court made a finding of fact at a July 11, 2014 hearing that the documents produced by the Government were in fact searchable. Wilkerson never clearly argued to the district court that the documents were not searchable. Rather, Wilkerson's counsel indicated that he was able to search the documents after receiving the necessary software in October 2013. Additionally, the Government provided a Bates index for the documents no later than December 2013, over seven months before trial. And the district court found no evidence of

---

[4]    This section discusses Wilkerson's Brady and discovery issues.

13

prosecutorial misconduct. Finally, an IT consultant and paralegal helped Wilkerson and her counsel search and review the documents. Given that Wilkerson was able to search the documents, they were not suppressed for purposes of Brady.

Furthermore, Wilkerson has failed to identify, either to the district court during trial or even on appeal after having extensive additional time to search the documents, any materially exculpatory evidence within the Government's productions.  Wilkerson claims on appeal that the following documents are exculpatory: (1) a February 1, 2009 email between Agent Gray and FDA Agent Richard Hartline discussing edits to Agent Gray's report of her investigation at PCA Blakely; (2) a March 15, 2009 email between Agent Gray and FDA Agent Robert Neligan regarding Agent Neligan editing Agent Gray's report about PCA-Blakely; (3) a February 3, 2009 email from Agent Gray to Erika Anderson regarding the timeline of when Agent Gray learned of the positive salmonella test results at PCA-Blakely; (4) the written report of Wilkerson's September 16, 2009 interview with Agent Hartline; and (5) a copy of Agent Gray's handwritten notes.

The three emails that Wilkerson cites show that Agent Gray consulted with other agents and departments regarding her report of the PCA-Blakely facility. The other agents suggested stylistic edits. Nothing in any of the emails suggests that Agent Gray or any other federal officer altered or fabricated the substantive facts in Agent Gray's report. Additionally, Stewart's counsel cross-examined Agent Gray

14

about one of these emails and the editing of her report at trial. Wilkerson fails to explain how her counsel's additional ability to cross-examine Agent Gray about the report would have altered the outcome at trial.

The written report of Wilkerson's statement to Agent Hartline denying that she told Agent Gray that she did not know of any positives in 2008 is arguably favorable to Wilkerson. But, as discussed below, Wilkerson could not have offered Agent Hartline's report of her statement to prove the truth of her statement at trial. Thus, this evidence could not have altered the jury's verdict. Finally, there is nothing exculpatory about Agent Gray's handwritten notes. The notes are consistent with Agent Gray's testimony that she asked Wilkerson if she knew of any positives in 2008 and Wilkerson answered in the negative.

### E.    Wilkerson's Severance Argument

Wilkerson's sole argument to the district court regarding severance related to her claim that she needed more time to review the Government's late production of documents. Because Wilkerson never presented to the district court any arguments which might support mandatory severance from the other two Appellants, we review the district court's failure to sever Wilkerson's trial for plain error. Although Wilkerson was only charged with obstruction of justice, evidence regarding the nature of the PCA conspiracy would have been admissible at a separate trial of Wilkerson. For example, the Government could have presented

15

evidence regarding PCA's misrepresentations to customers that the product had been tested when it had not in fact been tested and the fact that customers were not warned when previously shipped product tested positive for salmonella. In addition, all of the evidence regarding the seriousness of the salmonella outbreak would have been admissible. All of this evidence would have been admissible as evidence of Wilkerson's motive to lie.[5] Given the fact that all of this evidence would have been admissible in a separate trial against Wilkerson, the district court did not plainly err by failing to try Wilkerson separately.

F.    Other Issues Raised by Wilkerson

There is no evidence to support Wilkerson's conclusory arguments that Agent Gray fabricated her report or her handwritten notes or that the Government deleted specific documents relevant to Wilkerson from the files produced to her counsel. Nor is there any error plain or otherwise caused by the prosecutor's statement that Wilkerson was an unindicted co-conspirator. The prosecutor was responding to Wilkerson's counsel's objection to the prosecutor's question to Lightsey about an email to him from Wilkerson. The prosecutor's assertion that Wilkerson was an unindicted co-conspirator was not only amply supported by the evidence before the jury, but also was an appropriate response to Wilkerson's counsel's hearsay objection. In other words, it was not hearsay because it was a co-

---

[5]     It is only the volume of such evidence that perhaps could have been excluded in a separate trial of Wilkerson under Rule 403.

16

conspirator's statement in furtherance of the conspiracy. See Fed. R. Evid. 801(d)(2)(E).

Additionally, the prosecutor correctly told Wilkerson's counsel that there was no transcript of her interview with federal agents. Wilkerson's argument that this was a lie because her counsel misunderstood the statement is frivolous. And there was also no error in the district court's exclusion of Wilkerson's self-serving statement during her interview with Agent Hartline. Although Wilkerson's statement during that interview was a statement by a party, it was not admissible because it was offered by Wilkerson, not by a party opponent to Wilkerson. Finally, Wilkerson's argument on appeal that the district court erred in denying her post-trial request for transcripts is meritless. Notwithstanding the district court's repeated instructions that Wilkerson specify what part of the transcript was requested and the need therefore, Wilkerson's counsel failed to do so.[6]

G.    Sentencing Issues

1.    The Parnells' challenge to the Government's evidence of loss as not being sufficiently specific or reliable

The Parnells argue that the district court erred when it found Stewart responsible for a loss of $144.5 million and Michael responsible for a loss of $45.6

---

[6]    Other arguments raised by Appellants regarding their convictions are without merit and warrant no discussion.

17

million.   The Parnells argue that the evidence of loss presented by the Government was not sufficiently specific or reliable.

The Government chose to show loss by subpoenaing the 50 companies that purchased the most PCA products in 2008.   The subpoena gave the companies the option of providing the documents that reflected the company's financial loss and costs that they and their insurance carriers incurred because of the recall or of submitting "a comprehensive summary setting forth the requested information, provided that the Custodian is prepared to testify as to the accuracy and completeness of each such statement."   The subpoena also stated that the Government reserved the right to require the production of the documents underlying the spreadsheet and the provided statement of the document custodian warned that the submission of false or fraudulent information could lead to prosecution.   An FBI agent then created a spreadsheet that compiled all of the information, and the Government introduced both the spreadsheet and the underlying documents at trial.   In cross examination of the agent, the Defendants elicited the fact that she did not conduct an audit of the various submissions (although she did call a number of the victims), and the Defendants pointed out

18

that the agent did not understand some of the terminology used in some of the summaries submitted.[7]

The Government bears the burden of producing evidence that proves the loss by a preponderance of the evidence, which must be reliable and specific. United States v. Cobb, 842 F.3d 1213, 1219 (11th Cir. 2016). Actual loss is defined as "reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1, comment. n.3(A)(i)-(ii). The district court need only make a reasonable estimate of the loss, and we will defer to that determination. Cobb, 842 F.3d at 1218-19.

Our careful review of the record leaves us confident that the district court has not committed reversible error. We agree with the district court that the circumstances surrounding the submissions provide considerable reliability. Each company was warned that submission of false or fraudulent information exposed them to potential prosecution. Although the Defendants successfully pointed to some errors in the submissions, our careful review of the record leaves us confident that any such errors fall far short of reducing the verifiable loss calculation below an amount which could possibly have affected the sentence of

---

[7]    For example, the agent had intended to exclude lost sales from the loss calculation but the Kellogg's summary included two items representing lost sales (totaling $9.8 million). We note that the $9.8 million in lost sales is not only a miniscule amount, as compared to the $146 million of loss included by the agent.

any defendant.  For example, even considering only the Kellogg's submission, the summary chart provides evidence of well over the $20 million threshold for the 22-level enhancement applied to Michael.   That Kellogg's chart revealed $10.4 million in the years 2008-09 of losses labeled "recalled NSV."  That clearly refers to the net sales value of product actually recalled, which is clearly an appropriate loss for the loss calculation.  Similarly, that Kellogg's chart reveals $10.3 million in inventory lost because of the salmonella outbreak, which is again a clearly appropriate loss.  In addition, there were $4.1 million of "recall costs" in 2008-09, which again are clearly appropriate for the loss calculation.  And finally, "clean-up costs" of $1 million in 2009 is also a clearly appropriate loss.  That total of $25.8 million in losses easily exceeds the $20 million threshold which was the basis of the 22-level enhancement applied to Michael.

We note that that same $25.8 million of losses to Kellogg's are equally applicable and equally reliable as losses for which Stewart is responsible.  With respect to Stewart, there is ample other evidence, in addition to the Kellogg's $25.8 million loss, that is equally verifiable and equally reliable, such that there is no possibility that a remand could produce a loss calculation which could reduce his sentence.  For example, the loss figure submitted by Abbott Labs --
$13,624,612.15 – was supported by amply extensive and reliable documentation, and has not been questioned by Appellants either in the district court or on appeal.

20

In addition, the $12,750,000 loss calculation submitted by Hartford Insurance Company is undoubtedly reliable.   The insurance proceeds from Hartford Insurance Company were administered in the bankruptcy of PCA, and distributed to individual victims.  Appellants have not challenged the reliability of this $12,750,000 either in the district court or on appeal.  Thus, the losses suffered by Kellogg's, Abbott Labs, and Hartford Ins. Co. total more than $50 million, and are not subject to any substantial criticism with respect to verifiability or reliability. Although the district court enhanced the offense level of Stewart by 26 levels, an enhancement of 22 levels, rather than 26 levels, would have created the same maximum Guideline range of life imprisonment.   That 22-level enhancement is triggered by a threshold loss amount of $20 million, and, as noted above, a loss calculation of far more than $20 million is virtually assured in the event a remand in this case were ordered.   Thus, we conclude that any remand would be futile, and any errors in the district court's calculation are harmless.

2.  Defendant Michael's challenge to the 3-level increase in his offense level pursuant to Guideline section 3B1.1(b).

Section 3B1.1(b) provides a 3-level increase in the offense level "[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive."

21

U.S.S.G. § 3B1.1(b).[8]  The Guidelines commentary further instructs that "[t]o qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants." U.S.S.G. § 3B1.1 cmt. n.2.

Michael's argument on appeal is that there is insufficient evidence that he managed or supervised at least one participant in the conspiracy.   We conclude that his argument is wholly without merit.  Lightsey's testimony establishes that Michael managed or supervised at least Lightsey.  The evidence in the record reveals ample evidence that the district court correctly concluded that Michael's conduct warranted manager status.   For instance, he clearly exercised decision-making authority when he responded to Lightsey's urgent contact asking him about the scheme with respect to the Kellogg's account whereby false COAs accompanied shipments of product to Kellogg's.  The fact that Lightsey called Michael, rather than Stewart, about what he considered to be wrongful activity is evidence that he considered Michael to be one who exercised control, and the fact that he acquiesced when Michael instructed him to continue with the wrongful

---

[8]    Michael does not argue on appeal that the conspiracy involved fewer than five participants.

22

activity supports the district court's finding that Lightsey was in fact managed by defendant Michael.[9]

For the foregoing reasons, the judgment of the district court is AFFIRMED.

---

[9]    Any other arguments raised by Appellants challenging their sentences are rejected without discussion.