[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 21-12959

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

ROBERT "BOB" JOHNSON, JR.,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 9:19-cr-80223-KAM-2

_____

Before JILL PRYOR, BRANCH, and GRANT, Circuit Judges.

PER CURIAM:

Robert Johnson, Jr., appeals his 24-month sentence for conspiracy to commit healthcare fraud in violation of 18 U.S.C. § 1349. He argues that his sentence is procedurally unreasonable because the district court failed to make independent factual findings supported by specific and reliable evidence when determining the amount of restitution and the amount of loss used in calculating his Sentencing Guidelines sentencing range. He also contends that the district court erred by failing to investigate the possibility of a conflict of interest when defense counsel apologized to the court for having made unsupported factual representations based on information Johnson provided. Finding no reversible error, we affirm.

## I.

Johnson was employed by the Department of Veterans Affairs as an inventory management specialist at a VA medical facility. For at least five years, Johnson and others conspired to have the VA order and pay vendors for items that it did not need and that the vendors often did not provide. The vendors would then pay "kickbacks" to the involved employees.

A grand jury charged Johnson with one count of conspiracy to commit healthcare fraud, four counts of healthcare fraud, and one count of bribery. Johnson entered a guilty plea to the conspiracy charge pursuant to a written plea agreement in which he

stipulated to the facts recounted above.  In exchange, the government agreed to dismiss the remaining counts and recommend a reduction in Johnson's Sentencing Guidelines calculation for acceptance of responsibility and a sentence at the low end of his Guidelines range, unless Johnson was found to have misrepresented facts.  The parties also agreed that the loss amount attributable to Johnson was less than $1.5 million and would be determined by the court at sentencing.  The government reserved the right to recommend that the court find that the estimated loss amount attributable to Johnson was more than $550,000 but not more than $1.5 million, which would result in a 14-level increase to his Guidelines offense level, and that the offense involved a federal health program where the loss was more than $1 million, which would result in an additional 2-level increase to his offense level.

Before sentencing, the probation officer prepared a presentence investigation report (PSR) describing Johnson's background and his offense conduct and calculating a proposed Guidelines sentencing range.  The PSR stated, among other things, that Johnson and a coconspirator, Clinton Purvis, placed the "vast majority" of VA orders totaling approximately $852,000 with one group of vendors, placed orders totaling $1.2 million (of which approximately $850,000 represented fraudulent orders) with a second vendor group, and were the "primary recipients" of kickback payments from a third set of vendors.  The PSR stated that the government estimated that the loss attributable to Johnson was approximately

$800,000, the loss attributable to Purvis was approximately $1.4 million, and the total loss attributable to the vendors with whom Johnson was involved was over $6.6 million.

The PSR relied on those loss estimates to calculate Johnson's Guidelines sentencing range. Specifically, it calculated that under § 2B1.1 of the Guidelines, Johnson's base offense level should be increased by 14 levels based on his "total intended loss amount" of $800,000 and increased 2 additional levels because the offense "involved a federal health care program where the loss was more than $1 million." *See* U.S.S.G. § 2B1.1(b)(1)(H), (b)(7). These calculations resulted in a Guidelines sentencing range of 30 to 37 months in prison followed by 1 to 3 years of supervised release. The PSR also noted that according to the government, Johnson should be ordered to pay restitution in the amount of $800,000.

Johnson objected to the PSR's Guidelines calculations on the grounds that the $800,000 loss amount attributed to him was unsubstantiated and that the two-level enhancement under § 2B1.1(b)(7) depended on the district court finding that the loss attributable to him was more than $1 million.

Johnson also filed a sentencing memorandum in which he argued for a downward variance based on the simplicity of the offense, his lack of criminal history, his multiple medical conditions, his mental health, and his military service. In the memorandum, Johnson represented that his mental health conditions, including post-traumatic stress disorder, could be attributed in significant part "to his victimization in a hate crime while on active military

duty," in which "he was kidnapped, beaten, bound and dragged by a moving vehicle then suspended from a tree with a rope by his neck" and ultimately rescued by a law enforcement officer who removed "his unconscious, suspended body from the noose and tree."

Johnson argued that his honorable and distinguished military service also weighed in favor of a downward variance. He stated that he had attained the rank of E-8 in the Army (master sergeant), had completed "over 400 training and combat military jumps" as part of the 82nd Airborne Division, and had "participated in real world military operations where his unit was deployed as combatants and an occupational force." During "one of these operations," Johnson said, he "sustained near death injuries," including a broken back, leg, and arm, "when his parachute malfunctioned causing him to plummet to the ground with his partially deployed canopy." Johnson stated that because of these catastrophic injuries he had undergone 19 back surgeries, including "surgical placement of an indwelling nerve stimulator and spine cage for his vertebrae." Johnson said that he had continued to serve despite being offered the opportunity for a medical discharge.

Johnson also stated in his sentencing memorandum that he expected that he and the government would reach an agreement before sentencing as to restitution and the aggregate loss amount. At the first sentencing hearing, the parties represented that they had in fact reached an agreement on those issues. When the district court inquired about Johnson's objections to the PSR, defense

counsel responded that the parties had reached an agreement to resolve his objection to the monetary-loss amount. The government confirmed that the parties had agreed "that as to the conspiracy, there was a loss to a federal healthcare program over $1,000,000, and that as to this defendant, the amount in restitution owed is at $800,000." The court clarified, "So that means that the guideline range that was submitted by probation is correct?" The government agreed that it was, after which Johnson's attorney stated, "The guideline range, Judge, we're not going to contest, and I guess for the record as well, we withdraw the objection as to the aggregate tendered loss amount and the restitution amount, per the agreement." The district court then adopted the PSR's findings as its own, "with that agreement, and with the withdrawal of the objection."

After the government argued that a sentence at the low end of the Guidelines range (30 months) was appropriate, defense counsel argued in favor of a downward variance. He acknowledged that Johnson "was a part of the conspiracy, and the nature of the conspiracy, therefore, would make him accountable for a number of things, including an aggregate amount." He also acknowledged that "we understand the nature of the conspiracy and how he can be financially responsible for the monetary loss even though your hands are not in the pie. That's why we came to the table and we agreed with the previous prosecutor and [the current prosecutor] that we were not going to contest the 800,000 that is set for

restitution, nor the intent of the loss that is represented by the $1,000,000 marking in the pre-sentence report."[1]

Nonetheless, Johnson argued that a downward variance from his Guidelines range was appropriate, based in part on his military service. Counsel argued that Johnson's service was extraordinary not only because of his 20-year enlistment and honorable discharge, but also because of the nature of his service as a "combat-ready and combat-introduced soldier," his end rank of master sergeant, and his serious injuries during one combat mission when his parachute did not deploy properly, which he said resulted in a broken back, arm, and leg and hospitalization for 11 months.

Johnson testified in support of his request for a variance, confirming and elaborating on the claims he had made through counsel about his military service. For example, Johnson testified that he broke his back, arm, and leg during one military jump when his main parachute collapsed and his reserve chute got tangled and did not open completely. Johnson testified that he was hospitalized for 11 months after the injury and had 20 back surgeries, including placement of a protective cage around his spine and a nerve

---

[1] Where the defendant's criminal actions were undertaken as part of a conspiracy, his Guidelines loss calculation "may be based on the losses resulting from the reasonably foreseeable acts of co-conspirators in furtherance of the conspiracy." *United States v. Rodriguez*, 751 F.3d 1244, 1256 (11th Cir. 2014) (quoting *United States v. Mateos*, 623 F.3d 1350, 1370 (11th Cir. 2010)); *see* U.S.S.G. § 1B1.3(a)(1)(B). Contrary to Johnson's suggestion on appeal, therefore, the loss amount used to calculate a defendant's Guidelines range may exceed the amount of loss attributed to him individually.

stimulator from his neck to his tailbone to manage his constant pain from the injury. Despite his serious injuries, Johnson said, he requalified to jump and jumped again. By his count, he completed a total of 478 jumps during his military service.

Johnson testified that he traveled during the 1980s with the 82nd Airborne Division for operations in Grenada, Panama, Germany, and Iran, and participated in jumps in each location. He said that he sustained two injuries—a gunshot wound from a "ricochet bullet" and chemical burns from an incendiary device—while in Panama helping to destroy military equipment and documents. He testified that he was hit by another ricochet bullet in Germany when a fellow American soldier "freaked out" and fired shots inside a silo where they were both working.

Johnson testified that he has sarcoidosis (an inflammatory condition affecting the lungs and lymph nodes) from working with white phosphorous in the military, and he suffers from high blood pressure, glaucoma, and diabetes. He said that he also received mental health treatment in the military, beginning after an incident in 1977 when he and two other soldiers were attacked while traveling on leave through Jackson, Mississippi. Johnson said that he, "the black guy," was dragged from the car, tied up, and lifted up on a tree with a noose around his neck. He lost consciousness and was saved by the arrival of a deputy sheriff, who made the attackers cut him down. Johnson said that his attackers were not charged, but he and the other two soldiers were arrested and jailed for their own safety until their commander came to Jackson and had them

released.  At the commander's request, Johnson said, he began seeing a psychiatrist after the event, and he had continued the treatment since that time.

The government called David Spilker, a special agent with the VA Criminal Investigations Division, to testify at the sentencing hearing about his review of Johnson's military and VA records. Spilker testified that although Johnson trained as an infantryman and attended airborne school, he reclassified as a supply sergeant immediately upon his assignment to the 82nd Airborne Division in 1977 and served "as a general supply man" thereafter until he became a recruiter in 1986.  Spilker acknowledged that Johnson served honorably for 20 years and received several commendation medals, achievement medals, and good conduct medals.  He also acknowledged that Johnson was airborne qualified and would have had to jump five times to get his wings and once every three months thereafter to maintain his qualification, but he testified that Johnson's records did not contain a jump log recording the total number of jumps he made, and Spilker believed that Johnson's contention that he jumped 478 times during a ten-year period was "unsupportable."

According to Spilker, Johnson's military records contained no indication that Johnson had traveled with the 82nd Airborne to Grenada, Iran, or Panama for the operations he referenced in his testimony.  Johnson was assigned to a unit that deployed to Grenada, but he served the unit in a support position from Ft. Bragg in North Carolina—and in any event, the 82nd did not jump into

Grenada during the operation there.  The operation in Panama that Johnson had referenced took place in 1989, after Johnson left the airborne unit and began working as a recruiter in Miami.

Spilker further testified that Johnson's records indicated that the highest rank he attained was E-6 (staff sergeant), not E-8, and that there were no records of him being attacked and hung with a noose in the 1970s, receiving psychiatric care in the late 1970s or 1980s, or undergoing back surgery and being hospitalized for 11 months as a result of a parachute malfunction.  Johnson's records indicated that he was injured in one jump at Ft. Bragg, but he sustained only a bruised leg and was treated with Motrin, crutches, and a few weeks' exemption from physical training.  His records did not indicate that he ever injured his back or broke any bones during a jump, or that he was ever hospitalized due to injuries sustained in a jump or hospitalized for 11 months for any reason.

The district court indicated its concern that the parties were telling "very divergent stories of what may have occurred with Mr. Johnson's military career."  The court informed Johnson that it had been inclined to give him a variance from the Guidelines range based on Johnson's representations about his service, but if it turned out that Johnson was "making things up," the court would have "a different attitude."  The court postponed sentencing to give Johnson and his attorney an opportunity to review the records collected by the government and to obtain any other records that might support Johnson's version of the facts.

Three months later, Johnson filed an amended sentencing memorandum withdrawing some of his factual representations. Specifically, he amended his previous memorandum to state that the highest rank he achieved in the military was E-6 (staff sergeant), not E-8 (master sergeant); he was assigned to logistics support in the military and had no combat deployment; he had an unsubstantiated number of jumps, none of which were combat jumps; his injuries from a parachute malfunction were "non-serious" and did not involve a broken back, arm, and leg; and the "hate-crime incident" that he had described to the court was "unsubstantiated." Johnson also withdrew as unsubstantiated his representations that he had suffered gunshot wounds during his service and that he had had an opportunity to take a medical discharge from the military and declined it.

The amended memorandum stated that Johnson had "authorized the undersigned counsel to withdraw the above-referenced factual recitations and amend the sentencing representation. He was also afforded the opportunity to terminate the attorney-client relationship with the undersigned and to seek substitution of counsel if he objected to the foregoing remedial action." The memorandum also stated that "undersigned counsel stands prepared to undertake further remedial and responsive action consistent with the Rules Regulating the Florida Bar as the sentencing hearing advances, should the Defendant fail to testify or conduct himself consistent with the amended memorandum and personal or military service substantiated history." The amended

sentencing memorandum also reiterated that the "*Defendant and United States agreed upon restitution and aggregate loss amount.*" (emphasis in original).

At the beginning of the second sentencing hearing, the district court confirmed its understanding of the parties' prior resolution of the "issues about guideline calculations" and asked whether it recalled correctly that the guidelines calculations in the PSR had been adopted and there were no further issues with those calculations. Both parties answered in the affirmative.

The district court then asked defense counsel to speak about the withdrawal of some of Johnson's factual representations. Counsel stated that he had a desire and, under Florida Bar rules, a duty to "set the record straight." He expressed his belief in the importance of reputation and credibility in the practice of law and his hope that he would not lose the respect and confidence of the court. Counsel stated that as a Black man, he was particularly troubled by the representation that he had made on Johnson's behalf about the hate-crime incident, given the strong emotions evoked by allegations of racist violence. He called those representations "deplorable" and stated that he wanted "to make certain that that is retracted" because he was unable to represent to the court that the allegations were "unrebuttable truth." The court responded that it believed that counsel had "acted admirably and professionally, ethically," and had "made an excellent presentation on behalf of Mr. Johnson based upon what [counsel] believed in good faith were the facts."

Following this colloquy, the parties presented argument about the appropriate sentence for Johnson. The government advocated a sentence between 27 and 36 months, asking the court to consider not only the sentences of 27 months and 36 months received by two coconspirators with similar charges, but also the fact that Johnson had made several misrepresentations under oath about his military service.

Johnson's counsel requested a downward variance to a sentence between 18 and 20 months. He argued that while Johnson had retracted some of the representations made in his initial sentencing memorandum as unsubstantiated, his representations that he suffered from several serious health conditions, including sarcoidosis, an indwelling nerve stimulator and spine cage, high blood pressure, glaucoma, diabetes, and mental health conditions including post-traumatic stress disorder, anxiety, and depression had been substantiated and supported his request for a downward variance. He also discussed the sentences imposed on Johnson's codefendants, some of whom had cooperated with the government and received sentences of probation or short terms of imprisonment.

Against the advice of counsel, Johson addressed the court directly. He stated, "Your Honor, I would like to apologize to you, the other attorney, the probation officer and my attorney on my behalf. I'm truly sorry. If I could turn back the clock, Your Honor, I would do that. I would truly like to say, I'm sorry. I'm really, truly sorry. Thank you."

The district court stated that it was troubled by the fact that Johnson had made statements that were intended to influence the court in its sentencing decision and that later turned out to be inaccurate.  It explained that it had decided to vary below the Guidelines range, in part to ensure that Johnson was sentenced fairly in comparison to coconspirators, but that it was going to be "less generous in the variance" than it would have been if everything that Johnson had reported about his history had been accurate.  The court sentenced Johnson to 24 months in prison followed by two years of supervised release and imposed restitution in the amount of $800,000.  Johnson now appeals.

## II.

Ordinarily, we review the district court's factual findings regarding the amount of loss and the amount of restitution for clear error, and we review the court's application of the Sentencing Guidelines to the facts de novo.  *United States v. Cobb*, 842 F.3d 1213, 1218 (11th Cir. 2016); *United States v. Barrington*, 648 F.3d 1178, 1194–95 (11th Cir. 2011).  Where the defendant fails to raise an objection in the district court, we may review the issue for plain error, which generally requires the defendant to show that the district court committed a plain or obvious error that affected his substantial rights and that, "if left uncorrected, would seriously affect the fairness, integrity, or public reputation of a judicial proceeding." *United States v. Maurya*, 25 F.4th 829, 836 (11th Cir. 2022) (citation omitted).

Under the doctrine of "invited error," however, we will not review on appeal an error that was induced or invited by the appellant. *United States v. Harris*, 443 F.3d 822, 823–24 (11th Cir. 2006). Thus, when a defendant clearly and affirmatively withdraws a sentencing objection, he waives review of the objection on appeal, even for plain error. *Cobb*, 842 F.3d at 1222; *see also United States v. Masters*, 118 F.3d 1524, 1525–26 (11th Cir. 1997) (the "plain error doctrine is inapplicable" where a defendant knowingly withdraws a sentencing objection).

## III.

### A.

Johnson first argues that the district court's sentence was procedurally unreasonable because the district court failed to make independent factual findings supporting its Guidelines calculations based on the amount of loss and failed to properly calculate his restitution amount. We conclude that Johnson invited any error in this respect when he affirmatively withdrew his objection to those calculations at sentencing and explicitly agreed that the loss amount for Guidelines purposes was over $1 million and the correct amount for restitution was $800,000. *See Cobb*, 842 F.3d at 1222.

Johnson contends that the doctrine of waiver or invited error does not preclude review here because the district court did not address him directly to confirm that he agreed with his counsel's withdrawal of his earlier objections to the PSR. But although the

defendant's personal and explicit consent is required for the waiver of certain basic rights (such as the right to counsel and the right to plead not guilty), in most contexts a waiver expressed by counsel acting on the defendant's behalf is effective. *See New York v. Hill*, 528 U.S. 110, 114–15 (2000); *see also United States v. Jernigan*, 341 F.3d 1273, 1289–90 (11th Cir. 2003) (defendant waived argument alleging constitutional error in the admission of a codefendant's statements where defense counsel agreed to the introduction of the evidence at trial).

Where, as here, the subject of the waiver is the alleged lack of record evidence supporting the district court's sentencing decision, counsel's statement is sufficient to waive the issue on the defendant's behalf. *See Harris*, 443 F.3d at 823–24 (declining to review defendant's argument that the district court erred in failing to obtain a PSR where the record did not otherwise contain a sufficient factual basis for the sentence because defense counsel waived the PSR "and that waiver invited any error that may have arisen here"). Because any error by the district court with respect to the calculation of the Guidelines loss amount and the amount of restitution was invited by the defendant, we decline to review his argument on those issues on appeal.

## B.

Johnson next contends that the district court erred by failing to inquire into whether his attorney had a conflict of interest in representing him when counsel expressed his concern for his own reputation and credibility after learning that several

21-12959                Opinion of the Court                17

representations he made on Johnson's behalf (based on information provided by Johnson) were inaccurate or unsubstantiated. A criminal "defendant has a constitutional right to effective assistance of counsel at sentencing."[2] *Jones v. United States*, 224 F.3d 1251, 1259 (11th Cir. 2000) (citation omitted). Where the right to counsel exists, the defendant has "a correlative right to representation that is free from conflicts of interest." *Wood v. Georgia*, 450 U.S. 261, 271 (1981).

To safeguard this right, attorneys are obligated to inform the trial court immediately if a conflict of interest arises, and the trial court must then conduct an appropriate inquiry to determine whether continued representation is appropriate. *Holloway v. Arkansas*, 435 U.S. 475, 485–86 (1978). Trial courts must rely on the "good faith and good judgment" of defense counsel to determine whether a conflict of interest exists and to bring any conflicts to the court's attention—and if counsel does not notify the court of a conflict, the court generally may assume that either the representation is conflict-free or the defendant and his counsel knowingly accept the risk of the conflict. *Cuyler v. Sullivan*, 446 U.S. 335, 346–47 (1980). Trial courts have some duty to investigate apparent conflicts, but "[u]nless the trial court knows or reasonably should

---

[2] Johnson emphasizes that he is not, at this time, raising an ineffective-assistance-of-counsel claim. *See United States v. Patterson*, 595 F.3d 1324, 1328 (11th Cir. 2010) ("We will not generally consider claims of ineffective assistance of counsel raised on direct appeal where the district court did not entertain the claim nor develop a factual record.").

know that a particular conflict exists, the court need not initiate an inquiry." *Id.* at 347; *see Dallas v. Warden*, 964 F.3d 1285, 1303 (11th Cir. 2020).

Defense counsel's statements at sentencing did not require the district court to investigate whether he was laboring under a conflict of interest. Johnson argues that counsel's expression of concern for his own reputation and his statement that he found the unsubstantiated allegation that Johnson had been the victim of a racially motivated hate crime "deplorable" should have alerted the court to a potential conflict. We do not agree.

As Johnson concedes, defense counsel was required to withdraw several representations he had made to the court on Johnson's behalf once he learned that they were inaccurate. *See Nix v. Whiteside*, 475 U.S. 157, 176 (1986). Some statement by counsel acknowledging his duty of candor to the court, recognizing the gravity of the situation, and assuring the court that counsel would continue to uphold his ethical obligations likely was expected—and more importantly, was not necessarily inconsistent with Johnson's own interest. An attorney's credibility with the court is valuable not only to the attorney himself but also to his client, especially when the court has reason to doubt the client's own honesty. While the trial court undoubtedly was aware of counsel's embarrassment and dismay over having unintentionally misled the court, this alone is insufficient to show that the court knew or reasonably should have known that a conflict of interest existed. *See Sullivan*, 446 U.S. at 347. Even if the trial court was aware of some "vague,

21-12959                Opinion of the Court                19

unspecified possibility of conflict," it had no duty to investigate further under the circumstances. *Mickens v. Taylor*, 535 U.S. 162, 169 (2002).

## IV.

For the foregoing reasons, we affirm Johnson's conviction and sentence.

**AFFIRMED.**